UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                        )
                                        )
CHRISTOPHER MAYNARD,                    )
                                        )
                   Plaintiff,           )
                                        )
v.                                      )          Civil Action
                                        )          No. 18-12320-PBS
COMMONWEALTH OF MASSACHUSETTS,          )
MASSACHUSETTS BAY TRANSPORTATION        )
AUTHORITY, KENNETH GREEN, individually, )
and RICHARD SULLIVAN, individually,     )
                                        )
                   Defendants.          )
_____ )
```

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

February 18, 2021

Saris, D.J.

**INTRODUCTION**

Lieutenant Christopher Maynard ("Lt. Maynard") sues his former employer, the Massachusetts Bay Transportation Authority ("MBTA"), and its employees Kenneth Green ("Chief Green"), Chief of the MBTA Transit Police Department, and Richard Sullivan ("Supt. Sullivan"), Superintendent of the MBTA Transit Police Department, alleging discrimination based on race, veteran status, and union affiliation.  Specifically, he claims that the MBTA and Chief Green terminated his employment with the Transit Police Department because of his race (white) (Counts I, II, V,

1

and VI) and veteran status (Counts III and IV); and that Chief
Green additionally acted on the basis of union animus (Count
VII).  Against Supt. Sullivan, he brings a 28 U.S.C. § 1983
claim for retaliation based on his union affiliation (Count
VIII), as well as claims for interference with his due process
rights during arbitration (Count IX) and tortious interference
with his contractual relationship with the MBTA (Count X).

Defendants move for summary judgment on all claims.  For
the following reasons, the Court will **ALLOW** the motion filed by
the MBTA and Chief Green and **DENY** the motion filed by Supt.
Sullivan.

## BACKGROUND

The facts, viewed in the light most favorable to Lt.
Maynard as the nonmoving party, are as follows.

### I.   Initial Investigation

Members of the MBTA Police Department sometimes staff
"detail" assignments for contracting entities performing utility
or roadway work at a site within the MBTA's jurisdiction.  The
role of the detail officer is to ensure the safety of the
construction crew and the public. Although the contracting
entity ultimately pays detail officers for these assignments,
detail officers submit their claims for payment to the MBTA.
The MBTA will pay each detail officer through its internal

payroll system and then submit a claim for reimbursement with the contracting entity.

In late May 2015, a contractor complained to Lieutenant Daniel Fitzgerald ("Lt. Fitzgerald"), the commander of the unit in charge of details, about a bill it had received for a detail staffed by Lt. Maynard. The contractor reported that it had been billed for eight and a half hours even though the detail was a "no show" – i.e., a detail for which an officer had been assigned but for which no construction or utility crew showed up to perform the scheduled work – and should have only been subject to the four-hour minimum pay.  Lt. Fitzgerald escalated the complaint to Deputy Chief Preston Horton ("D.C. Horton"), who in turn passed it along to Chief Green and Gloria Andrews-Ward ("D.C. Andrews-Ward"), the individual serving as Deputy Chief of the Administrative Services Division at the time.

Chief Green decided to place Lt. Maynard on administrative paid leave while the MBTA investigated the contractor's complaint.  Because he considered Lt. Maynard a friend, he contracted with an outside agency to independently review the circumstances of the challenged detail. D.C. Andrews-Ward, for her part, initiated an internal probe to determine if Lt. Maynard had engaged in any broader pattern of misconduct, per standard departmental practice.

Based on the findings of the outside and internal investigations, Chief Green scheduled a disciplinary hearing on Lt. Maynard's misconduct. After hearing from the parties and reviewing their evidence, the Hearing Officer concluded in a June 17, 2016 decision that the MBTA had established "just cause" that Lt. Maynard had engaged in "a pattern of conduct to steal time and money from [the MBTA Police] Department."  Dkt. 36 ¶ 26.  Six days later, after consulting with his command staff (D.C. Horton, Supt. Sullivan, and D.C. Andrews-Ward), Chief Green decided to terminate Lt. Maynard's employment.

## II.  **Arbitration**

The MBTA Police Superior Officers Association (the "Superior Officers Union"), which represents lieutenants in the MBTA Police Department, demanded arbitration pursuant to the parties' Collective Bargaining Agreement to determine if there was "just cause" for terminating Lt. Maynard, who served as Vice President on the Union Executive Board. Arbitrator Gary Wooters ("Arbitrator Wooters") conducted a series of evidentiary hearings on the issue in February and March of 2017.

During these hearings, the parties disagreed as to whether the MBTA had any policy requiring detail officers to leave "no show" details and claim only the four-hour minimum pay. In support of his position that nothing prevented him from staying for the entire block of time scheduled by the contracting

4

entity, Lt. Maynard offered the testimony of Officer William Smith ("Officer Smith"), a patrol officer who had worked many "no show" details during his twenty-two-year career with the MBTA Police Department.[1]  Officer Smith indicated that department procedure for "no show" details is to remain on site.  When shown five of his detail slips marked "no show" but reporting more than four hours worked, Officer Smith verified their accuracy and stated that, as represented on the slips, he had remained on site for the entire scheduled period.

On July 7, 2017, Arbitrator Wooters issued a written decision on the matter.  He concluded that the MBTA had shown "just cause" for disciplining Lt. Maynard but not for terminating him.  He accordingly reopened the case and scheduled a new set of hearings to determine an appropriate remedy.

During the remedy hearings, Officer Smith recanted his prior testimony.  He stated that "he had lied at Lt. Maynard's request" and indicated that Lt. Maynard had fabricated the "no show" detail slips offered in the "just cause" hearings.  Dkt. 36 ¶ 44.  Lt. Maynard denied Officer Smith's allegations and offered counterevidence that Officer Smith had been coerced into changing his testimony.

---

[1] Officer Smith's race is not clear from the record.

Arbitrator Wooters issued his final decision on January 26, 2018.  Crediting Officer Smith's changed testimony over Lt. Maynard's testimony, he concluded that termination was an appropriate remedy.  In doing so, he noted that, but for the false testimony allegations, "a suspension of five working days with reinstatement would have been appropriate."  Dkt. 42-13 at 13.  The act of arranging for false testimony, however, had terminated Lt. Maynard's entitlement to reinstatement and back pay.

### III. <u>Investigation and Alleged Coercion of Officer Smith</u>

Supt. Sullivan was present when Officer Smith testified during the "just cause" phase of the arbitration.  Convinced that Officer Smith had lied because (1) Officer Smith's hearing testimony did not align with Supt. Sullivan's personal experience working "no show" details and (2) it seemed unlikely that Officer Smith would have experienced five "no show" details within a short period of time when "no show" details are typically rare occurrences, Supt. Sullivan reported to Chief Green that he intended to investigate Officer Smith for perjury. He asked Sean Reynolds ("D.C. Reynolds"), the new Deputy Chief of the Administrative Services Division, to assist in his investigation. D.C. Reynolds provided Supt. Sullivan with GPS records for the police cruiser which Officer Smith used to get to and from the relevant details.  The data reflected that,

contrary to his testimony otherwise, Officer Smith had not stayed on site for the entire block of time reported in the detail slips.  D.C. Reynolds also provided Supt. Sullivan with records from the MBTA Power Department, which oversaw two of the cited details and reported that work had been performed on both occasions.

On April 10, 2017, Supt. Sullivan notified Officer Robert Marino ("Officer Marino"), the president of Officer Smith's union (the "MBTA Police Association"), and union counsel that Officer Smith was under internal investigation.  He scheduled Officer Smith, whose wife appears to have had cancer at the time, for an administrative paid leave ("APL") hearing on April 13, 2017.

Although Supt. Sullivan was not scheduled to take part in the APL hearing itself, Officer Marino went to his office prior to the start of the meeting to get more information about the nature of the investigation. Supt. Sullivan indicated that he was investigating Officer Smith for perjury and relayed Officer Smith's testimony during the arbitration proceeding.

Officer Smith, Officer Marino, and union counsel met with D.C. Reynolds and D.C. Horton as scheduled, and D.C. Reynolds issued Officer Smith a formal APL notice.  D.C. Reynolds asked Officer Smith to sign the notice, and once Officer Smith had, D.C. Reynolds and D.C. Horton left without further discussion.

Officer Marino and union counsel then met privately with Officer
Smith.  Officer Marino strongly encouraged Officer Smith to tell
the truth during this private meeting.

In the wake of the April 13 APL meeting, D.C. Reynolds
expanded the scope of his investigation, per standard practice,
to determine whether Officer Smith had engaged in any broader
pattern of misconduct.  After uncovering further evidence of
misconduct, D.C. Reynolds scheduled an interview with Officer
Smith for July 11, 2017. Officer Smith arrived with his personal
attorney, union counsel, and a union representative. During the
interview, Officer Smith's attorneys invoked his Fifth Amendment
rights.  Officer Smith consequently did not answer any
substantive questions.

On July 17, 2017, D.C. Reynolds sent Officer Smith a notice
instructing him to come to headquarters for a disciplinary
hearing on July 27, 2017. A week later, Officer Smith's personal
attorney notified Supt. Sullivan that Officer Smith "will answer
that he committed perjury at the direction of Lt. Maynard to
assist Maynard in receiving a favorable outcome at his hearing"
and that "he and Maynard conspired to deceive the hearing
officer to benefit Maynard."  Dkts. 46 ¶ 73, 41-6 at 2.

The July 27, 2017 disciplinary hearing did not take place.
Instead, two weeks later, Officer Smith and his counsel met with
Supt. Sullivan, D.C. Reynolds, and MBTA counsel to discuss his

possible testimony at Lt. Maynard's upcoming remedy hearing.
During this meeting, Officer Smith signed a statement under oath
that the testimony he gave at Lt. Maynard's arbitration hearing
"was not the truth" and that he had lied "at Maynard's request."
Dkt. 41-7 at 2.

Officer Smith formally entered into a settlement agreement
with the MBTA on September 18, 2017.  The agreement provided
for, inter alia, a 30-day suspension without pay, assignment to
the Booking Desk for the remainder of his career, and a ban on
detail work for 60 days. In exchange, he agreed to testify
truthfully during Lt. Maynard's termination hearing, at risk of
"discharge" if he did not follow through.  Dkt. 41-8 at 3.

### IV.  Chief Green Interview

In April of 2016, a local radio station interviewed Chief
Green about his vision for the MBTA Police Department.  During
the interview, Chief Green discussed the preference given to
veterans in hiring decisions.  He acknowledged that veterans are
"deserv[ing] of having preference" but noted that "people in the
community deserve new positions as well."  Dkt. 42-14 at 12.  He
explained that he planned to navigate this "tricky situation" by
making a more "concentrated effort to recruit minority veterans
and minorities within the community."  Id.  He further expressed
a desire to "darken" up the department, which was then seventy-
four percent white.  Id. at 20

V.    **Union Activity**

Supt. Sullivan was a member of the Superior Officers Union during the entire time he was a lieutenant.  Prior to Supt. Sullivan's promotion to superintendent, while both were lieutenants, Lt. Maynard and Supt. Sullivan argued about whether the Superior Officers Union should pursue arbitration to achieve a good contract.  Lt. Maynard alleges that Supt. Sullivan took these disputes personally.

On June 28, 2016 – five days after his termination – Lt. Maynard posted a picture of Supt. Sullivan sleeping during an arbitration session onto a public forum.  Later that day, Supt. Sullivan called Lieutenant Richard Salisbury, a member of the Executive Board of the Superior Officers Union, stating that the General Manager of the MBTA had authorized him to hire a private detective to investigate the officers on the Executive Board (of which Lt. Maynard had been a part prior to his termination) at his own expense and threatening to spend up to $20,000 of his own money to sue them for "defamation of character."  Dkt. 47-4 ¶ 4.

**DISCUSSION**

I.    **Legal Standard**

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is
"material" if it "might affect the outcome of the suit under the
governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A dispute is "genuine" if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party." Id.

Generally, "a party seeking summary judgment always bears
the initial responsibility of informing the district court of
the basis for its motion." Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986).  "To succeed, the moving party must show that
there is an absence of evidence to support the nonmoving party's
position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).
Once it has made the requisite showing, the burden shifts to the
nonmovant to "present definite, competent evidence to rebut the
motion" and demonstrate that a "trialworthy issue persists."
Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)
(internal citations and quotations omitted).  "'[T]he mere
existence of a scintilla of evidence' is insufficient to defeat
a properly supported motion for summary judgment." Torres v.
E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000)
(quoting Anderson, 477 U.S. at 252).

## II. Racial Discrimination Claims (Counts I, II, V, and VI)

In Counts I, II, V, and VI, Lt. Maynard asserts that the
MBTA and Chief Green terminated him because of his race (white)

in violation of federal and state anti-discrimination law.[2]  He
suggests that he has offered direct evidence of discrimination.
The Court disagrees.  Lt. Maynard cites only to the April 2016
radio interview of Chief Green as direct evidence of racial
animus, and during that interview, Chief Green does not discuss,
even indirectly, the decisional process behind Lt. Maynard's
termination.  Cf. Patten v. Wal-Mart Stores E., Inc., 300 F.3d
21, 25 (1st Cir. 2002).  The contents of the radio interview
thus constitute circumstantial evidence, and the claim itself
must accordingly be assessed using the burden-shifting paradigm
set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973).

Under the McDonnell Douglas paradigm, a plaintiff bears the
initial burden "to show by a preponderance of the evidence a
prima facie case of discrimination" or retaliation.  Blare v.
Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d 111, 115
(Mass. 1995).  If the plaintiff makes the requisite showing, the
burden shifts to the employer to "rebut the presumption created

---

[2] Because the parties do not suggest that the federal and
state law claims should be treated differently in any
material respect, and because it is generally the practice
of the Massachusetts Supreme Judicial Court "to apply
Federal case law construing the Federal anti-discrimination
statutes in interpreting" Mass. Gen. Laws ch. 151B, Ponte
v. Steelcase Inc., 741 F.3d 310, 319 n.9 (1st Cir. 2014)
(quoting Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265,
268 (Mass. 1994)), the Court analyzes the claims together.

by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment] decision." Id. If the defendant proffers a legitimate, nondiscriminatory reason for its action, "the burden of production shifts back to the plaintiff employee, requiring the employee to provide evidence that 'the employer's articulated justification [for the termination] is not true but a pretext.'" Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016) (cleaned up) (quoting Blare, 646 N.E.2d at 116).

Chief Green and the MBTA appear to concede, for the purposes of this motion, that Lt. Maynard can establish a prima facie case of racial discrimination. They instead focus their arguments on the second and third stage of the McDonnell Douglas paradigm. They suggest that they have met their burden to articulate a legitimate, non-discriminatory reason for the termination – Lt. Maynard's misconduct, as confirmed by the results of two investigations and the decision of the Hearing Officer – and that Lt. Maynard has not "provide[d] evidence" that this "justification" is a pretext. See Bulwer, 46 N.E.3d at 33 (internal quotation marks and citations omitted).

Lt. Maynard purports to establish pretext in two ways. First, he argues that the extreme nature of the punishment – termination, even though Arbitrator Wooters indicated that a five-day suspension would have been more appropriate – is

13

suggestive of pretext.  Second, he cites to excerpts from an
April 2016 radio interview of Chief Green allegedly
demonstrating Chief Green's bias against white individuals.

Neither argument holds water.  As to the first argument,
the mere harshness of the punishment, standing alone, has little
bearing on whether the MBTA and Chief Green did, in fact,
terminate Lt. Maynard for misconduct.  Pretext hinges on the
truthfulness of an employer's justification.  See Bulwer, 46
N.E.3d at 33 (noting that, to establish a genuine dispute of
material fact, a defendant must "present evidence from which a
reasonable jury could infer that 'the respondent's facially
proper reasons given for its action against him were not the
real reasons for that action'" (quoting Wheelock Coll. v. Mass.
Comm'n Against Discrimination, 355 N.E.2d 309, 315 (Mass.
1976))); see also Kuznarowis v. Tobey Hosp., 320 F. Supp. 3d
307, 313 (D. Mass. 2018)("[A]n employee only prevails when an
[employer's] explanation has no reasonable support in the
evidence or is wholly disbelieved (and hence is transparently a
pretext)." (internal quotation marks and citations omitted),
aff'd, 748 F. App'x 362 (1st Cir. 2019))).  The severity of Lt.
Maynard's punishment thus is only relevant to the extent it
reflects some measure of untruthfulness in the justification for
the punishment. He points out that it was more severe than the
punishment received by Officer Smith for allegedly "much more

serious" behavior.  Dkt. 45 at 16.  However, there is insufficient evidence that Officer Smith is a similarly situated individual. The arbitrator concluded that Lt. Maynard submitted false evidence as the basis for his harsh sanction. While this is hotly disputed, it is undisputed that the arbitrator made disparate findings about both men.

As to the second argument, after reviewing the contents of the April 2016 radio interview, the Court finds nothing which might allow a reasonable juror to infer the existence of bias. Chief Green did not make any derogatory or negative statements about white individuals during the interview.  He merely discussed his hope of increasing diversity within the department.

The Court **ALLOWS** the motion for summary judgment on these claims and enters judgment in favor of the MBTA and Chief Green on Counts I, II, V, and VI.

### III.  **USERRA Claims (Counts III and IV)**

In Counts III and IV, Lt. Maynard asserts that the MBTA and Chief Green terminated him because of his veteran status in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301, et seq. Because Lt. Maynard does not appear to oppose this aspect of their motion, the Court will **ALLOW** the motion for summary

judgment and enter judgment in favor of the MBTA and Chief Green on both counts.

## IV.  **First Amendment Claims (Counts VII and VIII)**

Lt. Maynard asserts two retaliation claims under the First Amendment pursuant to § 1983: (1) that Chief Green unlawfully terminated him because of his union participation (Count VII) and (2) that Supt. Sullivan coerced a witness to change his testimony because of his union participation (Count VIII).  To make out a prima facie case of First Amendment retaliation, a plaintiff must show that "(1) he engaged in an activity protected by the First Amendment; (2) [the defendant] took an adverse action against him; and (3) there is a causal link between the protected activity and the adverse action."  Staples v. Gerry, 923 F.3d 7, 15 (1st Cir. 2019) (citing Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).

Defendants do not dispute that Lt. Maynard's participation in the Superior Officers Union qualifies as "activity protected by the First Amendment."  See id.  Chief Green contends, though, that Lt. Maynard has not established a causal link between his termination and any anti-union animus, and Supt. Sullivan argues that Lt. Maynard has not shown that he did, in fact, coerce Officer Smith or that, if he did, his actions can be tied to any anti-union animus.

The Court determines that Lt. Maynard has not met his burden to establish a genuine dispute of material fact on the claim against Chief Green.  The record contains no evidence that Chief Green harbored any anti-union animus, let alone that this animus was a substantial or motivating factor in the decision to terminate Lt. Maynard.  See Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2013).  The Court accordingly will **ALLOW** the motion for summary judgment and enter judgment in favor of Chief Green on Count VII.

The claim against Supt. Sullivan, however, presents a closer call.  Supt. Sullivan appears to concede that, if he coerced Officer Smith into changing his testimony, his actions would qualify as an adverse action.  See Dkt. 35 at 8-9 (arguing only that "Mr. Maynard cannot show that Supt. Sullivan took the alleged adverse action, i.e., that he coerced Officer Smith to recant his testimony"). In an employment context, the adverse action inquiry "focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views — or, more generally, on whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights." Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (internal quotation marks and citations omitted). Coercing a witness to falsify his testimony against an individual undoubtedly would have a chilling effect on that

individual and "deter" him "from exercising his constitutional rights."[3]  Id.

The record contains conflicting evidence, however, as to whether any coercion did, in fact, take place.  On the one hand, there is no direct evidence in the record that Supt. Sullivan coerced Officer Smith into altering his testimony, and every individual with whom he discussed the perjury investigation unequivocally states that Supt. Sullivan did not instruct him/her to pressure Officer Smith into recanting.  On the other hand, there is extensive circumstantial evidence which, taken as

---

[3] The parties do not brief what, if any, impact Arbitrator Wooters' arbitral finding that Officer Smith's testimony during the second hearing was truthful would have on Lt. Maynard's ability to show that Supt. Sullivan coerced Officer Smith into falsifying his testimony.  See Dkt. 35 at 8 n.3 (noting that whether "Officer Smith testified falsely in the second phase of the Arbitration" is not "material" to the pending motion because "none of the reasons set forth herein in support of summary judgment depend on whether or not that testimony was false"); see also Grimes v. BNSF Ry. Co., 746 F.3d 184, 188 (5th Cir. 2014) (suggesting that "arbitral proceedings can have preclusive effect even in litigation involving federal statutory and constitutional rights" and that "collateral estoppel may apply in federal-court litigation to facts found in arbitral proceedings as long as the court considers the 'federal interests warranting protection'" (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 223 (1985)) (emphasis in the original); Wolf v. Gruntal & Co., 45 F.3d 524, 528 (1st Cir. 1995) (indicating that a final arbitral award may, in some circumstances, be "entitled to the same preclusive effect as state court judgments, at least as concerns claims and issues actually raised"). The Court accordingly does not address this issue.

a whole, might allow a reasonable juror to infer that coercion
occurred.  Officer Smith, whose wife had cancer at the time of
the investigation, was facing prosecution and termination of his
job.  He testified during deposition that certain individuals
told him everything would "go away" and he could "go back to
working details" if he recanted his testimony.  Dkt. 47-2 at 6.
And while the parties dispute whether Supt. Sullivan was present
at the relevant meeting, there is some basis to believe that,
even if he was not, the individuals conveying this message were
acting under his direction at the time (which, in turn, might
render the statements non-hearsay as statements "made by a
person whom the party authorized to make a statement on the
subject" or by an agent of the party, see Fed. R. Evid.
801(d)(2)).  Supt. Sullivan, after all, personally initiated the
investigation, and he spoke privately to at least one of the
individuals advising Officer Smith – union representative
Officer Marino – prior to the start of the APL meeting.  There
is a reasonable inference that Officer Smith's attorney
understood Supt. Sullivan to be the authority behind the
message, to the extent any such message was imparted.  He sent
the offer to recant directly to Supt. Sullivan.

There is also some indication that Supt. Sullivan's receipt
of Officer Smith's offer had the allegedly promised effect.  The
pending disciplinary hearing for perjury, scheduled to occur two

days later, was cancelled, and the parties scheduled a separate meeting for August to negotiate a settlement.  During this August meeting, furthermore, Supt. Sullivan acted as the MBTA's agent in signing the agreement, which provided, inter alia, that Officer Smith would be subject to "discharge" if he did not follow through with recanting his testimony in Lt. Maynard's next arbitration hearing.  Dkt. 41-8 at 3.

In sum, a reasonable juror viewing this evidence in aggregate could find that Supt. Sullivan coerced Officer Smith into recanting his prior truthful testimony.

Turning to the causation prong, the Court again determines that Lt. Maynard has produced enough circumstantial evidence to establish a genuine dispute of material fact.  Lt. Maynard generally alleges that he had "many heated discussions, differences, conflicts regarding work matters, and contentious interactions" with Supt. Sullivan in his role as Vice President of the Superior Officers Union and that Supt. Sullivan took these disputes personally.  Dkts. 42-16 at 8-11, 42-19 at 7.  He also offers testimony from another member of the Superior Officers Union that Supt. Sullivan threatened to privately investigate and personally sue each member of the Union Executive Board (of which Lt. Maynard had been a part prior to his termination) using $20,000 of his own money.  Supt. Sullivan admittedly made this threat several days after Lt. Maynard's

termination, but it was made during the relevant time period.  A reasonable juror could find it demonstrative of a bias against union officials.  The Court accordingly **DENIES** the motion for summary judgment on Count VIII.

## V.   **MCRA Claim (Count IX)**

In Count IX, Lt. Maynard asserts that Supt. Sullivan interfered with his due process rights by coercing Officer Smith to change his testimony during Lt. Maynard's arbitration proceeding.[4]  To bring a claim under the Massachusetts Civil Rights Act (the "MCRA"), Mass. Gen. Laws ch. 12, § 11H, a plaintiff must show "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion."  Meuser v. Fed. Express Corp., 564 F.3d 507, 516 (1st Cir. 2009) (internal quotation marks and citations omitted).

Supt. Sullivan first argues that Lt. Maynard cannot establish a claim under the MCRA because he did not coerce Officer Smith.[5]  But his argument relies on the lawfulness of any

---

[4] Lt. Maynard does not bring a separate due process claim under federal law.

[5] Supt. Sullivan does not appear to dispute that coercion of Officer Smith, a third party, would satisfy the interference by means of "threats, intimidation, or

threatened means used to pressure Officer Smith into recanting, and the means would only be lawful if Officer Smith changed his testimony to the truth.  As Supt. Sullivan does not address whether Officer Smith's changed testimony was truthful, see Dkt. 35 at 8 n.3, the Court cannot allow summary judgment on this ground.  Supt. Sullivan alternatively contends that Lt. Maynard has not established any denial of due process rights.  In support, he highlights that, during the arbitration proceeding, Lt. Maynard had notice, a full evidentiary hearing, the ability to call witnesses of his own and to cross-examine the MBTA's witnesses, and an opportunity for post-hearing briefing. Again, resolution of this argument hinges on the truthfulness of Officer Smith's changed testimony and the existence of coercion. The Court accordingly **DENIES** the motion for summary judgment on Count IX.

## VI.   Intentional Interference Claim (Count X)

In Count X, Lt. Maynard asserts that Supt. Sullivan intentionally interfered with his contractual relationship with the MBTA.  To establish intentional interference with a contractual relationship, Lt. Maynard must prove that (1) "he had an advantageous relationship with" the MBTA; (2) Supt.

---

coercion" prong of Lt. Maynard's MCRA claim.  See Dkt. 35 at 12 (arguing only that "Supt. Sullivan did not coerce Officer Smith to recant his testimony" and that "Mr. Maynard was not deprived of his due process rights").

Sullivan "knowingly induced a breaking of the relationship"; (3) Supt. Sullivan acted under an "improper" motive or means; and (4) Supt. Sullivan's actions caused Lt. Maynard harm.  See Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (quoting Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007)). Because Supt. Sullivan supervised Lt. Maynard at the relevant time, Lt. Maynard must further show that the "improper" motive or means underlying Supt. Sullivan's actions encompassed actual malice.  See Pierce v. Cotuit Fire Dist., 741 F.3d 295, 304 (1st Cir. 2014) (citations omitted).  Mere hostility is insufficient. See id.

Supt. Sullivan argues that, because he had a legitimate interest in investigating and disciplining Officer Smith for perjury, Lt. Maynard cannot prove his actions were motivated by actual malice. Having found that a genuine dispute of material fact exists as to whether Supt. Sullivan coerced Officer Smith to change his testimony, however, the Court cannot resolve the issue of whether Supt. Sullivan only acted pursuant to a legitimate interest in investigating wrongdoing.  The Court accordingly **DENIES** the motion for summary judgment on Count X.

## ORDER

For the reasons stated above, the motion for summary judgment filed by the MBTA and Chief Green (Dkt. 32) is **ALLOWED** and the motion for summary judgment filed by Supt. Sullivan (Dkt. 34) is

**DENIED**.  The Clerk will enter judgment against Lt. Maynard on Counts I through VII.  Counts VIII through X will proceed to trial.

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge